1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   JULIE HARDER,                         No. CV 17-1426 PA (GJSx)

12               Plaintiff,                FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW
13        v.

14   BRISTOL-MYERS SQUIBB
     COMPANY LONG TERM
15   DISABILITY PLAN,

16               Defendant.

17

18        This is an Employee Retirement Income Security Act ("ERISA") action for recovery

19   of long-term disability benefits.  Plaintiff Julie Harder ("Plaintiff" or "Harder") seeks

20   benefits from defendant Bristol-Myers Squibb Company Long Term Disability Plan

21   ("Defendant" or the "Plan").  The Plan is sponsored and funded by Harder's former

22   employer Bristol-Myers Squibb Company ("BMS").

23        Plaintiff filed the Administrative Record ("AR") (Docket No. 29).  Following the

24   filing of the parties' Opening and Responsive Trial Briefs, the submission of their respective

25   Proposed Findings of Fact and Conclusions of Law, and their objections to each other's

26   Proposed Findings of Fact and Conclusions of Law, the Court, sitting without a jury,

27   conducted a bench trial on December 5, 2017.

28

Having considered the materials submitted by the parties and after reviewing the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

## I. Findings of Fact

1. This is an action for recovery of long-term disability benefits under ERISA. This Court has jurisdiction of this matter pursuant to 29 U.S.C. §§ 1132(a), (e), (f) and (g), as well as 28 U.S.C § 1331.

2. Venue is proper in this district because a substantial part of the events giving rise to the claim occurred within the Central District of California. 28 U.S.C. § 1391(b)(2).

3. Harder began working for BMS in 1989. Within two years, BMS promoted her to senior clinical site manager.

4. As a BMS employee, Harder was eligible to participate in the Plan. (AR 4091.) The Plan, which BMS self-funds (AR 5893), provides long-term disability benefits and defines "Total Disability" as:

> 1.6.1 during the first year of an Employee's disability (which shall include 26 weeks of "Disability" pursuant to the Short Term Disability Plan, as defined therein, and the first 26 weeks of Total Disability pursuant to this Plan) an Employee is absent from work because of the presence of an impairment for which there is material objective medical evidence that prevents the Employee from performing the essential functions of his own occupation or any other job that the Company offers him, with or without any reasonable accommodations that the Employee requests, other than a Temporary Alternative Work Duty assignment, for which he is reasonably qualified by reason of his education, training, or experience; and

1.6.2 after the Employee's first year of disability, as
defined in Section 1.6.1, an Employee is absent from work
because of the presence of an impairment for which there is
material objective medical evidence that prevents the Employee
from engaging in any occupation, with or without reasonable
accommodations, for which he is reasonably qualified by
education, training or experience.

(AR 5894-5895.)

5.    The Plan provides:

The determination of whether an Employee is Totally Disabled
shall be made in the sole discretion of the Plan Administrator, or
in the sole discretion of the Claims Administrator if the Plan
Administrator has delegated his power to make such
determination to the Claims Administrator, based upon the
material objective medical evidence that the Plan Administrator
or Claims Administrator determines to be relevant to the
Employee's claim.

(AR 5899.)

6.    Plan benefits continue until the "Employee ceases to be Totally Disabled" or
fails "to submit evidence of continuing Total Disability."  (AR 5899; see also AR 5915.)

7.    BMS has contracted with Aetna Life Insurance Company ("Aetna") to provide
claims administration services for the Plan.  (AR 5958.)  Pursuant to their contract, BMS
"delegates to Aetna complete discretionary authority and duty to Aetna to make all claim
determinations under the Disability plans."  (AR 5967.)  The agreement between BMS and
Aetna provides that, "[t]o the extent applicable, Aetna will process the claims for Plan
benefits . . . using Aetna's normal claim determination, payment and audit procedures and
applicable cost control standards in a manner consistent with the terms of the Plan, the
Services Agreement, and applicable law."  (AR 5974.)

1    8.    In November 2010, Harder's doctors determined that she was no longer able to

2    work due to her medical conditions, which included anxiety disorder and depression.  (AR

3    527.)

4    9.    Harder submitted a claim for short-term disability benefits and Aetna agreed

5    that she was disabled under the terms of the Plan.  Harder received short-term disability

6    benefits through May 1, 2011.

7    10.    Harder applied for long-term disability benefits under the Plan.  Aetna

8    approved long-term disability benefits beginning May 2, 2011.  (AR 901.)

9    11.    In an October 10, 2011 letter, Aetna concluded that Harder qualified for

10   disability benefits under the Plan's "any occupation standard" applicable after one year of

11   disability.  (AR 932.)

12   12.    In May 2012, Aetna arranged a psychological Independent Medical

13   Examination ("IME") for Harder with Dr. Kathi Studden.  (AR 4345.)  Tests administered

14   by Dr. Studden resulted in a diagnosis of "Major Depression, recurrent, severe, without

15   psychotic features, Generalized Anxiety Disorder, Posttraumatic Stress Disorder Avoidant,

16   Dependent and Schizoid Personality Traits."  (AR 4347.)  Dr. Studden's test results reflected

17   "no indication of malingering."  (Id.)

18   13.    On June 20, 2012, Harder was reassessed by Dr. David Freeman, whom

19   Harder had first met with for an "agreed" psychological evaluation in February 2011, and for

20   subsequent evaluations in August and December 2011.  (AR 4671.)  In a 110 page report

21   dated June 20, 2012, Dr. Freeman concluded that Harder "has undergone an intensification

22   of psychological symptomology such that our original diagnosis of Anxiety Disorder NOS

23   has developed into a Major Depressive Disorder, Single Episode with Anxious Features."

24   (AR 4777.)  Dr. Freeman's review of Harder's medical records, including from Harder's

25   treating mental health professionals, noted:

26            Per treating psychologist Shannae Anderson, Ph.D.'s treatment

27            notes dated March 1, April 1, and April 3, 2011 reveals that the

28            claimant's emotional condition has deteriorated subsequent to

-4-

the February 16, 2011 loss of her job.  In particular, Ms. Harder

was noted to be easily overwhelmed, labile, tearful, and

distractible with high anxiety and sadness, ongoing panic

attacks, distractibility, and passive suicidal ideation without plan.

Similarly, in her May 9, 2011 report, Ellen Shirman, PsyD noted

substantial sadness, crying spells, anxiety and tension,

heightened emotionality concentration and memory problems,

anger and agitation regarding her occupational situation.  Dr.

Shirman also observed that Ms. Harder was easily overwhelmed

and reported an increase in weight, problems with sleeping,

nightmares, changes in sexual functioning due to physical

limitation, and social withdrawal as well as diminished

motivation and self-confidence.  At the conclusion of her

examination of the claimant, Dr. Shirman also found that Ms.

Harder's symptom pattern was consistent with a Major

Depressive Disorder.

(AR 4777-78.)  Dr. Freeman assessed Harder as having a Global Assessment of Functioning

("GAF") of 55 on a 100 point scale, which is "warranted when there are moderate

symptoms."  (AR 4771.)

14.     In July 2012, Aetna arranged for an IME with Dr. Lorin Lindner.  Dr.

Lindner's report, dated August 4, 2012, stated that Harder "did not demonstrate 'emotional

decontrol' at any time during the evaluation" and noted that there "were no dramatic

emotional shifts, and only once did she begin to cry and she recovered very quickly (within

2-3 seconds) with minimal effort and answered the question at hand."  (AR 4129.)  Dr.

Lindner concluded that the tests she administered demonstrated that Harder suffered from no

cognitive impairment or any clinically significant behavioral impairment.  (Id.)

15.     On March 3, 2013, Aetna sent a letter to Harder in which Aetna "determined

that you no longer meet the definition of disability."  (AR 946.)  Aetna stated that Harder

would receive a final disability payment for March 2013, and that her "claim will be closed effective 04/01/2013." (AR 947.)

16. Harder, represented by counsel, appealed Aetna's decision on August 19, 2013. (AR 4211.) On September 18, 2013, in support of Harder's appeal, her counsel provided Aetna with records, including reports from her treating physicians, and a letter with counsel's argument in support of Harder's continued disability. (AR 4217-25.)

17. Among the materials provided by Harder's counsel was an April 19, 2013 letter from Dr. Anderson, in which Dr. Anderson stated:

> After reviewing the psychological evaluation and meeting with Julie, I am puzzled as to why you have chosen to stop her long-term disability. As numerous evaluations have noted, Julie has a consistent ability to "pull it together" for the examiner when evaluated. The greater issue for Julie is being able to cope under medium to high stress conditions for lengthy periods of time as would be necessary if she returned to full-time work. Julie's history throughout our work together has been one of taking a few steps forward and then a few steps back. She may be able to function better for short periods of time, but she quickly unravels and regresses back to where she started. She is still experiencing significant symptoms of anxiety and depression including insomnia, shortness of breath, panic, and high anxiety that often renders her frozen to complete even simple tasks. I am concerned about her ability to return to work full-time at this time. I am recommending that she be able to continue with her disability while returning to work on a part-time basis so that she can slowly ease back into the demands of work while integrating that stress into her daily life. I fear if she is required to return to work on a full-time basis, that it

would be a set up for failure for her and once again she would

regress back to an anxiety-ridden paralyzed state.  As it is she is

barely able to tackle the necessary demands of dealing with her

disability denial, her workman's comp situation, and managing

daily life.  A very slow return to work with a minimally stressful

work environment is required for Julie to succeed after this time

on disability.

(AR 4353.)

18.     Dr. Studden, whom Aetna had arranged to conduct an IME in May 2012

before becoming one of Harder's treating mental health professionals in June 2013,

supported Harder's appeal with a September 13, 2013 letter.  According to Dr. Studden,

Harder was "working on issues of anxiety, panic, posttraumatic stress disorder and

depression subsequent to extreme work stress at her previous employment."  (AR 4349.)  Dr.

Studden's opinion was "that Ms. Harder is unable to work due to her significant symptoms."

(Id.)

19.     Aetna obtained "paper reviews" from doctors specializing in physical

medicine and rehabilitation and psychology.  The reviewing psychologist, Dr. Leonard

Schnur, concluded there was a "lack of examination findings to substantiate the presence of

a functional impairment across cognitive, emotional, and behavioral spheres for the time

period of 4/1/2013 through 10/4/2013 which would have precluded the claimant from

performing the work of any occupation."  (AR 3939.)

20.     Aetna issued a letter dated October 30, 2013, in which it upheld its original

decision to terminate Harder's benefits effective April 1, 2013.  (AR 966-68.)

21.     Harder, again through counsel, filed a second appeal on April 24, 2014.  The

second appeal included a letter from counsel (AR 3941-55) and additional reports from

Harder's physicians, including letters from Harder's psychiatrist, Dr. Martin Schuster, dated

March 17, 2017, and April 10, 2014, letters from Dr. Studden dated February 13, 2014, and

April 21, 2014, and a March 21, 2014 letter from Dr. Alvin Mahoney, whom Harder had

been seeing weekly at the Mission Community Hospital Turning Point Intensive Outpatient Psychiatric Program beginning in August 2013.  (Id.)

22.    In his March 17, 2014 letter, Dr. Schuster states:

> Ms. Harder came to me to discuss high work stress and requested that I see her as a patient to help her in managing medication for increasing anxiety and depression that she began to experience with extreme work demands.  Several psychotropic medications and several psychiatric follow-up appointments later it is clear that Ms. Julie Harder had a diagnosis of Bipolar Disorder II, Mixed.  Her response to antidepressants was initially fair-good; however, she always continued with a disabling degree of anxiety which was felt to be caused by her need to manage pain related to Worker's Compensation injury and in her clinical presentation (i.e. her concerns of inability to complete work under the high stress that was required at work).  She continues to experience nightly insomnia without medication and becomes tearful with anxiety and panic like reactions when faced with deadlines or high work demands.  She was unable to focus on tasks indicating that even managing requirements of this LTD case add high anxiety to her life.
>
> At no time in my clinical care of Ms. Harder it was felt she could perform her habitual work duties, because of her disabling condition, i.e. chronic pain, severe anxiety, severe insomnia, lack of concentration, restlessness, inattention, etc. in fact these symptoms led her to start drinking alcohol to self medicate.  This clearly brought very negative consequences to her family life, downhill to her marriage and relationship with her children.  Almost to the point of alienating herself from

them.  The pain this cause in her was something she still carries
and prevents her from adequately functioning.  She started an
outpatient psychiatric program at Mission Community Hospital
not just to deal with this disastrous situation in her life but a fair
support system as well.

(AR 3956).

23.    Dr. Studden's February 13, 2014 letter stated that Harder "continues to exhibit and experience symptoms of Posttraumatic Stress Disorder and Major Depressive Disorder. These symptoms include hopelessness, psychomotor retardation, excessive crying, difficulties with attention and concentration, difficulties with sleep and appetite, increased startle response, and intrusive flashbacks.  These symptoms would most certainly interfere with any ability to perform in a work situation."  (AR 3976.)  According to Dr. Studden: "[A]t the present time, Ms. Harder is unable to perform in an employee capacity."  (Id.)

24.    Dr. Studden's April 21, 2014 letter stated:

It is my opinion that Ms. Harder continues to meet the
diagnosis of Major Depression, Posttraumatic Stress Disorder
and Generalized Anxiety Disorder.  Despite her high cognitive
functioning, she continues to have the symptoms of mood
swings, frequent crying, feelings of hopelessness, significant
weight loss, very poor sleep, irritability, extreme distractibility,
problems with memory and concentration, low motivation and
impaired activities of living.  She displays an inability to
complete even simple tasks and she has impaired judgment.
This has impacted her ability to work and has had a significant
impact on her relationships with her family and friends.

It is my strong opinion that Ms. Harder has consistently
remained unable to work and that this condition was present

1     from my initial meeting with her in May of 2012, and has

2     persisted until the present time.

3         In April of 2014, I repeated the Millon Clinical Multy-

4     Axial Inventory to ascertain Ms. Harder's level of functioning.

5     She displays very high scores on depression, Posttraumatic

6     Stress Disorder and anxiety, indicating consistency of her

7     condition.

8 (AR 3983-84.)

9     25.    Dr. Mahoney's March 21, 2014 letter stated:

10         Ms. Harder attends Turning Point Intensive Outpatient

11     Psychiatric Program weekly since August 13, 2013. Ms. Harder

12     is learning effective coping skills to manage symptoms

13     associated with anxiety, depression and cumulated stress

14     reportedly from prior work. Ms. Harder continues to present

15     with intense levels of anxiety, bouts of crying, difficulty

16     focusing on tasks, and feeling panicked when triggered, with

17     excessive rumination and worry. Ms. Harder reports that when

18     faced with having to do tasks, such as "phone calls, paperwork,

19     documentation or opening mail" that she is often flooded with

20     emotions and "reliving past work trauma related to years of

21     trying to obtain unrealistic work demands." Ms. Harder receives

22     support in regaining task management skills, with emphasis on

23     emotion regulation and decreasing panic, when feeling flooded.

24         Ms. Harder reports that her chronic pain, "due to prior

25     work related injuries, such as bilateral knee pain with instability

26     and back pain" increases her anxiety and limits her coping

27     mechanisms. Ms. Harder is receiving support to learn

28     alternative, safe coping skills to effectively manage mood related

symptoms associated with her pain and subsequent physical limitations.

Based upon our clinical observations of Ms. Harder's fragility under stressful situations, returning to work may exacerbate her symptoms and contribute to a decline in the progress she is currently making. It is my recommendation, at this time, that Ms. Harder not return to work and be reinstated for long term disability.

(AR 3977.)

26. In considering Harder's second appeal, Aetna obtained paper reviews from Dr. Alison Netski, a psychiatrist, and Angela Stillwagon, D.O., who specializes in physical medicine and rehabilitation. Dr. Elana Mendelssohn, an Aetna in-house psychologist, participated on Aetna's appeal committee and also reviewed the file.

27. According to Dr. Netski, "[b]ased on the record provided for review, restrictions and limitations from occupational functioning are supported from 4/12/13 through 3/7/14." (AR 3930.) Dr. Netski also stated that "[t]he severity of symptoms have necessitated intensive outpatient treatment/partial hospitalization. The claimant does not have the persistence and pace needed for occupational functioning and lacks emotional control." (Id.) Dr. Netski concluded that she was "in agreement with the opinion of the treating provider that she is unable to function in the occupational setting during this timeframe." (Id.)

28. From a physical standpoint, Dr. Stillwagon opined that from "6/27/09 to present, restrictions in regards to musculoskeletal complaints would include: no repetitive kneeling, squatting, crawling or climbing. No other restrictions would be permanent." (AR 3921.) Dr. Stillwagon did not address "restrictions for her psychological complaints . . . as this is outside my realm of expertise." (Id.)

29. Dr. Mendelssohn and Aetna's appeal committee noted, on July 24, 2014, that the last medical record on file was dated April 21, 2014, which would make sense because

Harder filed her appeal on April 24, 2014. (AR 771.) Dr. Mendelssohn concluded that the information in Harder's record "would support a functional impairment from a mental health perspective 04/01/13-05/01/14." (Id.)

30. In a July 24, 2014 letter, Aetna "partially overturned" the original decision to terminate Harder's disability benefits effective April 1, 2013. (AR 982.) According to Aetna's letter:

> [T]he Aetna Appeals Committee . . . have determined that from a mental health perspective there is clinical data that would have prevented Ms. Harder from performing the material duties of her own occupation from April 01, 2013 through May 01, 2014, only. However, there is a lack of medical information (i.e. progress notes documenting abnormal physical exam supporting a functional impairment that would have prevented her from performing work at any reasonable occupation as of May 01, 2014 only. LTD benefits will remain terminated effective May 02, 2014. According to [Harder's] group plan, this decision is final and is not subject to further review.

(AR 984.)

31. Harder commenced an action, Case No. CV 14-6922 PA (SHx), in this Court on September 5, 2014, in which she sought relief from Aetna's decision to terminate benefits effective May 1, 2014.

32. After reviewing the parties' Joint 26(f) Report in Case No. CV 14-6922, the Court ordered the parties to show cause why the matter should not be remanded to the ERISA administrator because Aetna's July 24, 2014 decision was based on different facts and conclusions than its March 2013 termination decision, and Harder had not had an opportunity to administratively appeal the July 2014 decision. (Docket No. 22 in Case No. CV 14-6922.)

33.     In response to the Court's order to show cause, the parties stipulated to dismiss Case No. CV 14-6922 without prejudice.  (Docket No. 24 in Case No. CV 14-6922.)

34.     Pursuant to the agreement of the parties, Harder's counsel filed an appeal in July 2015 of Aetna's July 24, 2014 decision to terminate Harder's benefits.  (AR 3853-57.) That appeal was supported by approximately 882 pages of documents.  (Id.)

35.     On November 5, 2015, Aetna issued a decision in which it "agreed with the original decision to terminate the benefit as of May 2, 2014."  (AR 1004.)  According to Aetna's November 5, 2015 denial of Harder's appeal:

> When we approved Ms. Harder's LTD benefits through May 1,
> 2014, we had medical information that supported functional
> impairments that would prevent Ms. Harder from performing the
> material duties of her own and any reasonable occupation due to
> a mental health condition.  The level of symptoms reported
> including poor stress intolerance, high anxiety, and insomnia
> necessitate an elevated level of care with intensive
> outpatient/partial hospitalization programs.  However, more
> recent medical information has been reviewed which does not
> demonstrate the same level of impairment as previously
> reported.

(AR 1005.)

36.     In support of its conclusion, Aetna cited, among other records, treatment notes from the Mission Community Hospital Turning Point Intensive Outpatient Psychiatric Program from July 25, 2014,[1] letters and reports from Dr. Mahoney dated January 22, 2015, February 12, 2015, March 19, 2015, April 30, 2015, May 12, 2015, May 28, 2015, June 9,

---

[1]     Aetna's letter wrongly states that Harder started attending the outpatient program on July 15, 2014.  (AR 1005.)  Harder actually started attending that program in August 2013. (AR 3977.)

1  2015, and July 15, 2015, and notes from Dr. Schuster dated December 11, 2014, and March

2  10, 2015.  (AR 1005-06.)

3      37.    Aetna's letter states:

4          The treatment notes do not describe psychiatric

5      symptomatology based on behavioral observations other than

6      that she is noted to be depressed and anxious, however, there is

7      no information regarding frequency, intensity or duration

8      provided.  It is noted that she had some difficulties in performing

9      specific tasks such as driving in heavy traffic or reading and

10     following directions which is based on her self-report but there

11     is no support based or clinical evidence provided.

12         Ms. Harder has not undergone mental status examinations

13     or objective assessments of cognitive functioning by a qualified

14     professional.  Mood was typically noted to be stable, with some

15     episodes of tearfulness related to discussion of difficult or

16     painful topics.  The psychologist-reviewer opined there is no

17     evidence in the documents submitted for review to support a

18     conclusion of functional impairment for the time period, May 2,

19     2014 forward.  In the opinion of the psychologist-reviewer, the

20     medical evidence submitted for review does not support a

21     conclusion of severe impairment that precludes full-time

22     employment.  Ms. Harder appeared to be able to complete a daily

23     routine effectively and is reported to be participating in a

24     volunteer program providing equine experiences to autistic

25     children, which is presumed to require patience, focus, stress

26     tolerance, flexibility, and problem solving.

27 (AR 1006-07.)

28

1  38. Aetna's letter did not cite to scores of other treatment notes from the Mission

2 Community Hospital Turning Point Intensive Outpatient Psychiatric Program from the April

3 2014 through June 2015 time period in which Harder's mood and affect were described as

4 "sad," "anxious," "dysphoric," "agitated," and "tearful," among other similar terms.  (AR

5 1312-1402 & 1965-2190.)

6  39. In addition to the treatment notes from the outpatient program, Dr. Mahoney

7 submitted a letter in support of Harder's appeal, dated July 15, 2015, in which he states:

> I am writing on behalf of Ms. Julie Harder, who has been
> under my care while attending Turning Point Intensive
> Out-Patient Program since August 13, 2013.  Ms. Harder
> continues work on identifying triggers and applying coping
> techniques to better manage her debilitating anxiety and panic
> attacks related to PTSD, secondary to work stress and chronic
> pain following work related injury.  Ms. Harder reports that she
> experiences severe anxiety and panic attacks when faced with
> complex tasks, when needing to drive in heavy traffic and when
> needing to address mail and phone calls.  Ms. Harder becomes
> distracted easily, unable to read without re-reading lines several
> times.  Her comprehension is also effected, making reading and
> following written instructions to be anxiety producing.
>
> In both group therapy and in my private sessions, Ms.
> Harder continues to demonstrate tearful episodes and flooding
> when faced with complex tasks.  Ms. Harder reports that she
> becomes frozen, confused and overwhelmed if needing to
> address any type of documentation, filling out forms and/or in
> just completing serried tasks (including ADLs).  Ms. Harder
> continues to attend the Turning Point twice per week (Tues and
> Thurs) where she attends six group therapy sessions/week

(including Stress management, Symptom Management,

Dialectical Behavioral Therapy, Cognitive Behavior Therapy,

Seeking Safety and Grief and Loss) and she meets with me

monthly.  Ms. Harder has a private Psychiatrist that she sees

outside of Turning Point who manages her medications.  Ms.

Harder is working individually with her Case Manager, and

within group therapy, to early identify anxiety triggers and to

continue practice of coping skills to assist her in reaching her

goal of returning to her best self and participating actively in life

without restricting anxiety and panic.

     It is my clinical opinion that Julie Harder should remain

on disability at this time.

(AR 1311.)

40.    Harder's counsel filed a second appeal on May 3, 2016.  (AR 2798-13.)  In support of that appeal, Harder's counsel submitted to Aetna 587 additional pages of records in support of the appeal in addition to the 882 pages of documents submitted in support of the July 2015 appeal.  (AR 2789.)

41.    On August 11, 2016, Aetna issued a decision on Harder's second appeal in which it "agreed with the original decision to terminate the benefit as of May 2, 2014."  (AR 1022.)  According to Aetna, "the majority of the medical documentation submitted for consideration are with regards to her treatment protocol in 2013" (Id.) even though Harder submitted hundreds of pages concerning her treatment in 2014 and 2015.  Aetna's letter conveyed the opinion of the psychology reviewer it retained, who opined that "[s]ymptoms are not of a severity that would impact work activity from May 02, 2014 through the present time" and "found no support for a functional impairment due to any mental or emotional diagnosis or symptoms."  (Id.)

42.    Having exhausted her administrative remedies for a second time, Plaintiff commenced this action on February 22, 2017.

## II.    Conclusions of Law

1.    A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989); <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 522 F.3d 863, 866 (9th Cir. 2008).  Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion.  <u>Firestone</u>, 489 U.S. at 115, 109 S. Ct. at 957.  However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the administrator or fiduciary.  <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1089 (9th Cir. 1999).

2.    The Plan confers discretionary authority on the administrator and Aetna.  (AR 5899 & 5967.)

3.    Once the Court concludes that the policy vests discretionary authority in the administrator or fiduciary, the Court must determine whether the administrator or fiduciary is operating under a conflict of interest.  In recent decisions, first the Ninth Circuit, and then the Supreme Court, determined that the abuse of discretion standard still applies even when the administrator has a conflict of interest.  <u>See</u> <u>Metro. Life Ins. Co. v. Glenn</u>, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.  We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case."); <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 965 (2006) ("Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict

of interest. But <u>Firestone</u> also makes clear that the existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.").

4.  "What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." <u>Abatie</u>, 458 F. 3d at 969. In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." <u>Id.</u> at 968; <u>Saffon</u>, 522 F.3d at 868-69. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." <u>Abatie</u>, 458 F.3d at 970.

5.  Here, Aetna is not the funding source for the plan. It therefore does not operate under a structural conflict of interest. Nevertheless, it promised to apply, "to the extent applicable," its "normal claim determination, payment and audit procedures, and cost control standards in a manner consistent with the terms of the Plan, the Services Agreement, and applicable law." (AR 5957.) Although the Court's ultimate determination would be the same even if it applied no skepticism at all to Aetna's decision to terminate Harder's benefits, the Court concludes that a minimal level of skepticism is appropriate in these circumstances to inform its review of Aetna's determinations under the abuse of discretion standard.

6.  "[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we may not merely substitute our view for that of the fact finder. To do so, we consider whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.' That standard makes sense in the ERISA context, so we apply it, with the

qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011) (quoting United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)). "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" Conkright v. Frommert, 559 U.S. 506, 521, 130 S. Ct. 1640, 1651, 176 L. Ed. 2d 469 (2010) (quoting Firestone, 489 U.S. at 111, 109 S. Ct. at 954)). The deference accorded to administrators "does not suddenly disappear simply because a plan administrator has made a single honest mistake." Id. at 518, 130 S. Ct. at 1649.

7.     "[C]onditioning an award on the existence of evidence that cannot exist is arbitrary and capricious." Salomaa, 642 F.3d at 678. The "continual shifting" of a plan's grounds for denial may "also suggest abuse of discretion." Id. at 679.

8.     Where an administrator denies a claim for benefits "based on absence of some sort of medical evidence or explanation," the administrator is "obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided." Id. at 680. "An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.' Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo." Id.

9.     "[T]he burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant. . . . That benefits had previously been awarded and paid may be evidence relevant to the issue of whether the claimant was disabled and entitled to benefits at a later date, but that fact should not itself shift the burden of proof." Muniz v. Amec Constr. Mgm't, Inc., 623 F.3d 1290, 1296 (9th Cir. 2010).

**III.     Analysis**

The Court concludes, after reviewing the Administrative Record, and considering the arguments and Trial Briefs submitted by the parties, that Plaintiff satisfied her burden to

establish that she remained totally disabled as defined by the Plan beyond May 1, 2014, and that Aetna's decision to terminate benefits as of May 2, 2014, was arbitrary and capricious.

Specifically, by concluding that its July 24, 2014 decision "partially overturning" its termination of benefits was based on "a lack of medical information (ie. progress notes documenting abnormal physical exam supporting a functional impairment that would have prevented her from performing work at any reasonable occupation as of May 01, 2014 only," Aetna abused its discretion. (AR 984.) That determination is illogical because Harder submitted her appeal and supporting documentation on April 24, 2014. (AR 3941-55.) As a result, it was impossible for Harder to submit evidence to support her continued disability beyond May 1, 2014.

As Aetna's decision "partially overturning" its previous termination of benefits acknowledges, the evidence submitted by Harder as of that date supports the conclusion that her disability continued at least through May 1, 2014. At the time Aetna terminated her benefits beginning on May 2, 2014, Aetna was not in possession of any evidence that Harder's condition had improved after the submission of her appeal on April 24, 2014. Aetna's abuse of discretion is compounded by the fact that although it overturned its previous termination of benefits beginning on April 1, 2013, it originally provided her with no opportunity to appeal its new decision to terminate her benefits as of May 1, 2014.

Aetna's decisions in the second round of appeals, issued on November 5, 2015, and August 11, 2016, affirmed the original July 24, 2014 decision. Although those decisions did provide Harder with an opportunity to provide additional evidence in support of her contention that she remained disabled beyond May 1, 2014, and Aetna and its reviewers did consider at least most of that additional evidence, those reviews did not cure the arbitrariness of the original July 24, 2014 decision. Aetna's selective reliance on a small number of the voluminous treatment notes submitted by Harder's mental health providers, and particular reliance on notes and letters from December 11, 2014, January 22, 2015, February 12, 2015, March 10, 2015, March 19, 2015, April 30, 2015, May 12, 2015, May 28, 2015, June 9, 2015, and July 15, 2015 (AR 1005-06), may provide some support for a conclusion that

Harder was not totally disabled by sometime in late 2014 or mid-2015,[2] but that evidence does little to support Aetna's conclusion that Harder was no longer disabled as of May 2, 2014. Moreover, the erroneous statements by Aetna and its reviewers concerning the dates during which Harder participated in the Mission Community Hospital Turning Point Intensive Outpatient Psychiatric Program, and her ability to maintain full-time employment while receiving treatment twice each week for "her debilitating anxiety and panic attacks related to PTSD, secondary to work stress and chronic pain following work related injury" confirms Aetna's decisions on appeal were arbitrary and capricious. The reasons for Aetna's denials, and the type of evidence Aetna deemed important, also shifted as Harder's counsel responded in the appeals to the stated bases of the prior denials. The Court therefore concludes that Aetna abused its discretion when it terminated Harder's benefits beginning on May 2, 2014.

### Conclusion

For all of the foregoing reasons, the Court concludes that Plaintiff has met her burden of proof to establish that the Plan's termination of her disability benefits beginning on May 2, 2014, was arbitrary and capricious. Plaintiff is therefore entitled to reinstatement of her long-term disability benefits under the Plan beginning on May 2, 2014. Plaintiff shall submit a proposed Judgment by no later than December 13, 2017. Defendant's objections to the proposed Judgment, if any, shall be filed no later than December 20, 2017. The Court will issue a separate order with the deadlines and procedures for the filing of a Motion for Attorneys' Fees.

IT IS SO ORDERED.

DATED: December 6, 2017

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE

---

[2] Because the only issue before the Court is whether Aetna abused its discretion by terminating Harder's disability benefits beginning on May 2, 2014, the Court makes no determination whether Harder ceased being disabled under the Plan at some later date.

-21-